# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF NORFOLK, OCTOBER TERM 1846, AT DEDHAM.

PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE,
Hon. CHARLES A. DEWEY, } Justices.
Hon. SAMUEL HUBBARD,

---

## COMMONWEALTH vs. WILLIAM P. BLODGETT & another.

The Rev. Sts. c. 125, § 20, providing for the punishment of those who, without lawful authority, forcibly confine any person in this State, or carry any person out of the State, against his will, apply to soldiers of another State, acting under martial law, and under the military authorities of that State, in time of civil war and insurrection there, who come into this State and seize and carry away the insurgent citizens of that State, who are found here.

One State of the Union, in time of insurrection and civil war in that State, has no authority to give orders to her troops to pass over the lines and into the territory of another State, to protect herself against insurgents, and to capture her rebel citizens who have recently fled over those lines; and such orders cannot shield her citizens or soldiers from being criminally responsible, in the courts of another State, for there seizing such insurgents, though such citizens or soldiers, when acting under such orders, are subject to martial law in their own State; unless there be a necessity, or probable cause of necessity, for the defence or protection of the lives and property of the citizens of such other State, or for the defence of the State itself, that the acts directed by such orders should be done. And of this necessity, or probable cause of necessity, the jury, and not the authorities of such other State, are the ultimate judges.

Commonwealth *v.* Blodgett & another.

THIS was an indictment against William P. Blodgett, Stephen Hendrick and Darius Briggs, founded on the Rev. Sts. c. 125, § 20, and alleging, in the first count, that said defendants, "at Bellingham, in the county of Norfolk, on the 30th of June 1842, with force and arms, in and upon one Arnold Whipple, and in and upon one Oliver Ballou, and in and upon one William T. Olney, and in and upon one Timothy Walker, all of whom were then and there in the peace of said Commonwealth being, did make an assault, and then and there said Whipple, Ballou, Olney and Walker, then and there, without any lawful authority therefor, and without the consent and against the will of them, the said Whipple, Ballou, Olney and Walker, did forcibly confine and imprison, for a long space of time, to wit, for the space of three hours, against the peace," &c. The second count alleged a like assault on the same persons, by the defendants, on the same day, and at the same place, and a confinement of them, without any lawful authority, with intent and design to send, and cause to be sent, them from and out of the limits of said Commonwealth, without their consent, and against their will. The third count alleged that the defendants, at the same time and place, bound the said Whipple and others, with cords and ropes, and kept them in confinement, without any lawful authority, with the intent and design averred in the second count.

A trial was had in the court of common pleas, April term 1843, before *Allen,* J. when Briggs was acquitted, and the jury could not agree as to Blodgett and Hendrick, who were again brought to trial, at the April term of the same court, in 1844, before *Cummins,* J. who signed the bill of exceptions which follows:

It was proved on the part of the government, upon the trial of this cause, that the defendants, about the hour of one o'clock on the morning of June 30th 1842, with about twenty other armed men, broke open the house of Jeremiah Crooks in Bellingham in this county, and there seized and bound the four persons named in the indictment, and, after keeping them some hours in custody, carried them bound to

Rhode Island. The defendant Blodgett acted as leader of the party, and the defendant Hendrick as guide and assistant. While searching the house and making the seizures aforesaid, threats of shooting were made use of by some of said party. And when Blodgett was asked by what authority he acted, he replied, ' by authority of this,' presenting his gun and bayonet to the breast of Crooks. He afterwards said he had a requisition from governor King, and a warrant from governor Davis, to arrest the persons above named. No resistance was offered by Crooks or any of the inmates of his house. They were wholly unarmed, and had retired to bed at the usual hour, the evening before; and the neighborhood had been, and was, quiet and peaceful. When the defendants arrived at Crooks's house, it was shut and fastened, and all its inmates were in bed and asleep. The house is situated about three miles from the village of Woonsocket, and was at this time kept by Crooks as a house of public entertainment; and the men who were seized and carried off by the defendants, as aforesaid, came to Crooks's house and put up there as travellers and lodgers.

The defendants, to maintain the issue on their part, and in justification or excuse of their assault upon, and forcible seizure and imprisonment of, the said Olney, Ballou, Whipple and Walker, as set forth in the several counts of the indictment, with the intent therein laid, called sundry witnesses, to wit, Thomas A. Jenckes, Samuel Curry, Charles J. Shelley, William Gibbs McNeill, William C. Gibbs, Edward H. Sprague, Edward Harris, Willis Cook and others, and by them proved, or claimed to have been proved, that at the time in said indictment mentioned, and for a long time previous, the State of Rhode Island and Providence Plantations was, and had actually been, in a state of insurrection and civil war; that an organized attempt had been made, and was then carrying on, by force of arms, to overthrow the government and constitution of government of said State, and to impose and substitute another government and constitution of government in their stead: That to effect this, a constitution of

government was assumed to have been adopted by various persons, styling themselves a majority of the citizens of said State of Rhode Island, &c. to the number of seven thousand and upwards, and claiming to be the people of Rhode Island, and elections had been held, under and by virtue of the same, against the laws and existing authorities of said State : That by said elections, a government, claiming to derive its powers from said constitution, so called, was, on the 4th of May 1842, actually organized at Providence, within said State, as the General Assembly thereof, and proceeded to pass divers laws, so called, and to elect officers, civil and military, for said State : That under said consitution, so called, and by virtue of said elections, one Thomas W. Dorr claimed to be governor, captain general and commander in chief of said State, and on the 17th and 18th days of said May, at Providence in said State, as such governor, &c. summoned the militia of said State to aid him in overthrowing the existing government, and in taking possession of the public property of said State : That on the morning of the said 18th of May, and in the night time, with divers of his followers, collected upon the summons aforesaid, to the number of about four hundred, with arms, and in martial array, the said Dorr proceeded to attack the state's arsenal of said State of Rhode Island, &c. situated in said Providence, and summoned the same to surrender to him ; the same being garrisoned and guarded by the officers and soldiers of said State ; and, upon refusal of said garrison and guard to surrender, surrounded and attempted to fire cannon against the same : That upon the same day, the said Dorr, with his said followers, were proceeded against by the existing authorities of said State, with the militia of said State, and were put to flight and pursued out of said State : That the said Dorr, having, as he asserted, and as was believed by the people and authorities of said State, a large body of sympathizers and adherents in several of the neighboring States, who in public meetings openly supported him in his said attempt upon said State, and having, as he asserted, and as was believed by the people and authorities of said State, received

promises of large military assistance in men, money, arms and military stores, from his said sympathizers and adherents in Philadelphia, New York and Boston, and from the neighboring States of Connecticut and Massachusetts generally, secretly organized his followers anew, in said State of Rhode Island, and especially in the northern parts of said State, and in the towns and villages bordering on the State of Massachusetts : That in the month of June 1842, in the village of Woonsocket, in the town of Cumberland in said State, and within a mile and a half of the line of the town of Bellingham in Massachusetts, the followers of said Dorr were openly drilled and paraded, as insurgent companies, and were supplied, or supplied themselves, with arms and ammunition, in preparation for some expected contest ; and that, in other parts of the State, attempts were made by the breaking open of powder houses and taking of powder therefrom, and by the taking of cannon, and attempting to take cannon, in the night time, as well as in other ways, to supply the followers of said Dorr with arms and military stores : That just before the 25th of June 1842, the followers of said Dorr began to concentrate themselves in force at Chepachet, a village in the town of Glocester, in said State of Rhode Island, within six miles of the Connecticut line, and within twelve miles of said Woonsocket, and there threw up embankments on an eminence, called Acotes Hill, to cover and protect the camp there by them formed : That martial law was by them there, and in said village of Chepachet, exercised, and citizens of Rhode Island, sent out by the existing authorities of said State, as scouts to ascertain the state of things in said Chepachet, were by the followers of said Dorr taken prisoners of war, roughly treated, and marched from said Chepachet to said Woonsocket, as at that time the place of greater strength in the cause of said Dorr : That for about a week previous to the assembling of the followers of said Dorr at said Chepachet, they had held military possession of said village of Woonsocket, keeping up, in all the avenues leading thereto, armed guards and patrols, stopping travellers and unarmed persons, and finally marched

off, in one body, just before said 25th of June, about one hundred and thirty men to said Chepachet: That due preparations having, as was supposed, been made by said Dorr and his adherents, on the 25th of June 1842, the said Dorr returned to the said State of Rhode Island, and on the morning of that day arrived at said camp in Chepachet, as his head-quarters, and on the same day issued his proclamation in the words and figures following, to wit: 'State of Rhode Island and Providence Plantations. A Proclamation, by the governor of the same. By virtue of the authority vested in me by the constitution, I hereby convene the General Assembly, which was adjourned to meet at Providence on Monday the 4th of July next, at the town of Glocester, on the same day, for the transaction of such business as may come before them. And I hereby request the towns and districts, in which vacancies may have occurred by the resignation of representatives or senators, to proceed forthwith to supply the same by new elections, according to the provisions of the constitution. Given under my hand and seal of State, at Glocester, the 25th day of June, A. D. 1842. Thomas W. Dorr:' That on the same day, the said Dorr issued, as governor and commander in chief, general orders to the military of said State of Rhode Island, in the words and figures following: 'General Orders. Head-Quarters, Glocester, R. I. June 25th 1842. I hereby direct the military of this State, who are in favor of the people's constitution, to repair forthwith to head-quarters, there to await further orders; and I request all volunteers and volunteer companies, so disposed, to do the same. It has become the duty of all citizens, who believe that the people are sovereign, and have a right to make and alter their forms of government, now to sustain, by all necessary means, the constitution adopted and established by the people of this State, and the government elected under the same. The only alternative is an abject submission to a despotism, in its various practical effects, without a parallel in the history of the American States. I call upon the people of Rhode Island to assert their rights, and to vindicate the freedom which they

are qualified to enjoy in common with the other citizens of
the American Republic. I cannot doubt that they will cheer-
fully and promptly respond to this appeal to their patriotism,
and to their sense of justice ; and that they will show them-
selves, in this exigency, to be worthy descendants of those
ancestors who aided in achieving our national independence.
Thomas W. Dorr, Governor and Commander in Chief:' That
the members of Dorr's assembly did not assemble, as invited,
many of them having resigned ; many of his former adherents
discountenanced his resort to force ; and some of them took
up arms against him ; and there was evidence tending to show,
that at no one time were there more than three hundred and
fifty men on Acote's Hill, but that they were continually com-
ing and going.

It was also proved by the defendants, that on the said 25th
of June 1842, the General Assembly of said State of Rhode
Island, &c. convened at Newport in said State, passed the fol-
lowing act, which, at the time mentioned in said indictment,
was, and for a long time afterwards continued to be, in force,
unrepealed and unsuspended, as a law of said State of Rhode
Island, to wit : ' An act establishing Martial Law in this State.
Be it enacted by the General Assembly, as follows : Section
1st. The State of Rhode Island and Providence Plantations
is hereby placed under martial law, and the same is declared
to be in full force, until otherwise ordered by the General
Assembly, or suspended by proclamation of his Excellency the
Governor of this State :' That thereupon a proclamation in
the words and figures following was issued by Samuel Ward
King, then the governor and commander in chief of said
State : ' By his Excellency,. Samuel Ward King, Governor
and Commander in Chief of the State of Rhode Island and
Providence Plantations. A Proclamation. Whereas the Gen-
eral Assembly of the said State of Rhode Island and Provi-
dence Plantations did, on the twenty fifth day of June instant,
pass the act following to wit,' (setting forth the above act,) ' I
do therefore issue this my proclamation, to make known the
ume to the good people of this State, and all others, that

they may govern themselves accordingly: And I do warn all persons against any intercourse or connexion with the traitor, Thomas Wilson Dorr, or his deluded adherents now assembled in arms against the laws and government of this State, and admonish and command the said Thomas Wilson Dorr, and his adherents, immediately to throw down their arms and disperse; that peace and order may be restored to our suffering community, and as they will answer to the contrary at their peril. Further; I exhort the good people of this State to aid and support, by example and by arms, the civil and military authorities thereof in pursuing and bringing to condign punishment all engaged in said unholy and criminal enterprise against the peace and dignity of the State. Samuel Ward King:' That the militia of said State of Rhode Island were assembled, by the governor of said State, at or near Providence, to the number of between three and four thousand; business in Providence and generally throughout the State being suspended, and specie and other valuables being sent out of the State, by the banks and others, in expectation of a contest in arms: That on said 25th of June, William Gibbs McNeill was duly appointed and commissioned, by the governor and council of Rhode Island, as a major-general of said State, to command the troops of said State in the field, and on the same day assumed and took command of said troops: That said McNeill detached and sent different bodies of troops from said Providence, and other parts of the State, under suitable command, by various routes, upon said Chepachet, for the purpose of surrounding, attacking and taking prisoners the followers of Dorr there encamped; and sent other detachments of his said troops to points near the lines of Massachusetts and Connecticut, there to take post: That, among other detachments, he ordered to take post at said Woonsocket a detachment of about three hundred men under the command of Major Josiah H. Martin, which detachment consisted of the National Cadets and the Sea Fencibles, chartered military companies of Providence, selected from the volunteer ward companies of said Providence, and of a

volunteer company raised in the town of Cumberland in said State : That the defendant Blodgett was a member of said company of Sea Fencibles, and actually serving in the ranks of the same, at said Woonsocket, before, at and after the time in the said indictment mentioned; that he also bore the commission of colonel, as one of the aids-de-camp of the governor of Rhode Island, though then serving in the ranks of said company ; his services as aid-de-camp not being then required : That said Martin took post at Woonsocket on the evening of the 27th of June 1842, where he was also joined by the said Cumberland volunteers ; and that the said company of Sea Fencibles, to which said Blodgett was attached, arrived at said Woonsocket on the 28th day of said June, together with the one hundred men selected from the said volunteer ward companies of Providence, and there remained posted, at and after the time mentioned in the several counts of said indictment, under the command of said Martin : That said Dorr and his followers remained in their camp at said Chepachet, until the evening of Monday the 27th day of said June, when, upon the approach of the troops of said State of Rhode Island, and while said troops were at Greenville and other places, and the day before the same arrived at said Chepachet, they fled from their said camp, and in great part escaped over the lines into the States of Connecticut and Massachusetts ; Dorr having issued an order to his troops to disperse : That it was greatly apprehended, by the commanding general and the authorities of Rhode Island, that the fugitives from said camp would reassemble in force in said States of Connecticut and Massachusetts, and, with such assistance as they could rally, break into the State of Rhode Island at some point favorable for an attack, and destroy the lives and property of the people of said State : That this fear especially existed with regard to the post and village of Woonsocket, so that on Monday night, the 27th June, the detachment at that village, then consisting of little over one hundred men, were ordered to retreat, and did actually retreat upon the troops sent to reinforce them ; being deemed too few to

Commonwealth *v.* Blodgett & another.

withstand the attack with which it was reported they were threatened, upon the breaking up of the camp at Chepachet; but that no such attack was made : That on the same evening, two or three hundred people collected on the lines between Massachusetts and Rhode Island, at the village of Pawtucket, and on the Massachusetts side ; that there was a collision between said people, so collected, and the military of Rhode Island placed to guard the lines of Rhode Island, and said people were only dispersed upon being fired upon by the guard, which resulted in the death of an Irishman residing at said Pawtucket : That before, at and after the time mentioned in said indictment, the inhabitants of said village of Woonsocket were greatly in fear that said village would be attacked and burnt by the insurgents, from threats which had been made ; said village, before its occupation by said detachment of the troops of Rhode Island, having been long regarded as the strong hold of the disaffected; that during the occupation of said village by said troops, viz. until the 2d of July 1842, strict guard and patrol was kept in all the avenues leading to the same ; and after said village was evacuated by said troops, a guard was organized and paid by the inhabitants of said village, for the protection of the same : That when, by orders dated the 28th and 29th of June 1842, Colonel Brown, commanding at Chepachet, was ordered to return, with the principal portion of his command, to Providence, he was ordered to detach the Warren Artillery and the Warren Infantry, consisting of about two hundred men, to Providence, by the circuitous route of Woonsocket, for the protection of said village, and to sweep the lines of the State on the Massachusetts side, and to prevent head being made, by the fugitives from the said camp of Chepachet, against Rhode Island from the Massachusetts side; and that said troops met with no resistance on their said route : That on the same day the following order was issued to said Colonel Brown, and for the same purpose : 'Head-Quarters, Div. R. I. Forces. Providence, June 29th 1842. Colonel W. A. Brown will forthwith despatch the detachment already ordered, of twenty five

mounted men, under the command of whomsoever he may designate, to reconnoitre the country within fifty miles of Chepachet, in whatsoever direction he may think most probable to intercept the enemy. He will arrest and confine any and all who may seem to be of the suspicious character herein alluded to, and report his doings promptly at head-quarters by express or otherwise, by order of Major-General McNeill. Elisha Dyer, jr. Adjutant General : ' That on the same day a general order was published, that there was no longer a necessity for the continuance of the troops in general in the field, and that they might retire to their several homes : That under the same apprehension, and with the same view, on the said 29th of June, the said Major-General McNeill, as was testified by himself, and his aid, George Rivers, and by Samuel Curry, despatched his said aid to said Major Martin, commanding at said Woonsocket, informing him of the state of things at Pawtucket, and ordering him, in defence of the lives and property of the citizens of Rhode Island, to pay no regard to state lines, and to pursue the enemy within fifty miles of his post, and over the lines of Massachusetts, and with express reference to Bellingham in said State, where the said General McNeill understood the enemy had fled : That said order was delivered verbally by said Rivers to said Martin, as it was communicated by said McNeill to said Rivers : That under the same apprehension that the fugitives from the camp of the followers of Dorr would reassemble from over lines in Rhode Island, in force, and to prevent the same, the quarter-master-general of the State of Rhode Island was ordered, on the 30th of June 1842, by the said General McNeill, then in command, to furnish sixty horses, and equipments for men and horses complete, to be procured forthwith, by purchase or otherwise, which horses and equipments were procured by purchase under said order, at a very heavy expense ; and that on the same day the said quarter-master-general was ordered, by said General McNeill, to furnish light transportation for two hundred men, to be kept always in readiness until

further orders, that the said general might be able to move rapidly a body of two hundred men to any portion of the lines which might be threatened ; which quick transportation was provided and held in readiness for the purposes aforesaid : That the said Major Martin, commanding at Woonsocket, having received information that the followers of Dorr were in numbers assembled at Waterford, Millville, and said Bellingham, and that the said William T. Olney and others of them were at Crooks's tavern in said Bellingham, ordered the defendant Blodgett to take twenty men under his command, and to proceed to said Crooks's tavern, in said Bellingham, and there to arrest and bring to the head-quarters of said Martin, the said William T. Olney and others of the insurgents who might be found with him : That said order was given by said Martin, the commander of said post at Woonsocket, to said Blodgett, in the night of the said 29th of June 1842 ; and that said Blodgett selected a party of about twenty men, under the orders of his commanding officer as aforesaid, and took with him, as a guide in his said expedition, the defendant Hendrick, as one of his said party : That he proceeded with his said party to the house of Jeremiah Crooks in said Bellingham, and there, at about one o'clock in the morning of the 30th of June 1842, in compliance with his said orders, captured and brought, with his said party, to the head-quarters of his said commanding officer at said Woonsocket, the said William T. Olney, Oliver Ballou, Arnold Whipple and Timothy Walker, and that they were received by said Martin and by the authorities of Rhode Island, and proceeded against as prisoners of war : That the said Olney, Ballou, Whipple and Walker were all citizens of said State of Rhode Island, and of the Dorr party : That said Olney was a captain of an insurgent artillery company, raised at said Woonsocket, and that said Olney, Ballou and Walker had all been under arms, on the side of Dorr, in the said camp at Chepachet, and that said Whipple was of Dorr's party, and went to the camp of the insurgents, and had thence fled, upon the breaking up of said camp, over the lines into the State of Massachusetts, having

reached the house of said Crooks, in said Bellingham, on the evening of the said 29th of June ; and that, (as said Blodgett and Hendrick proved,) at the October session of the General Assembly of the said State of Rhode Island, &c. in 1843, the said General Assembly passed the following resolutions : 'In General Assembly, October Session, 1843. *Resolved,* That the sum of two thousand five hundred and nine dollars and seventy six cents be, and the same is hereby, allowed to William P. Blodgett, and the sum of two hundred and fifty two dollars and eighty seven cents be, and the same is hereby, allowed to Stephen Hendrick, for the purpose of remunerating them for loss of time and expenses in attending to prosecutions instituted against them in the State of Massachusetts for entering the house of one Jeremiah Crooks, in the town of Bellingham, in the State of Massachusetts aforesaid, in the execution of a military order, and arresting William T. Olney and others, who had been in arms against the government of this State, and fled to the State of Massachusetts.'

There was no other evidence tending to show any legislative or executive sanction or adoption, by the authorities of Rhode Island, of the acts complained of in the indictment. But it was proved that the governor of Massachusetts, soon after the occurrence, sent the adjutant-general of this Commonwealth to Rhode Island, to ascertain whether the conduct at Crooks's tavern was authorized or countenanced by the authorities of that State ; and that thereupon the executive of Rhode Island disclaimed and repudiated the act. And it further appeared that the governor of Rhode Island, upon a requisition made by the governor of this Commonwealth, after the finding of this indictment, surrendered the defendants to be tried thereon.

The capturing and carrying to Rhode Island of the said Olney, Ballou, Whipple and Walker, by the said Blodgett and Hendrick, under the order and in the manner above stated, was the only assault and imprisonment of the said Olney, Ballou, Whipple and Walker, by the said Blodgett and Hendrick, proved in support of said indictment.

Whereupon, the counsel for the defendants prayed the court to instruct the jury, ' that the statute, under which the prisoners were indicted, to wit, the Rev. Sts. c. 125, § 20, was not applicable to their case as proved, and that the defendants could not be properly convicted under it ; the same being obviously intended solely to apply to other and entirely different classes of cases, not including the case of the defendants.' This instruction the court refused to give, but did instruct the jury, that the said statute was intended for or might well embrace the case of the defendants, though acting as soldiers of Rhode Island, under martial law, in time of civil war and insurrection, and under the orders of the military authorities of said State of Rhode Island.

And the counsel for the defendants further prayed the court to instruct the jury, ' that if they found that the said Olney, Ballou, Whipple and Walker were citizens of the said State of Rhode Island, and had been in arms as insurgents, as aforesaid, against said State, and upon the approach of the troops of said State, had fresh fled from their said insurgent camp to Massachusetts, for refuge from the authorities and troops of Rhode Island merely, the said Olney, Ballou, Whipple and Walker were not in the peace of Massachusetts, as alleged in said indictment, nor within the protection of the laws of Massachusetts, as against the laws and authority of Rhode Island, so as to render the defendants criminally liable in Massachusetts, for the arrest and imprisonment of said Olney, Ballou, Whipple and Walker, within the territory of Massachusetts, and with intent to carry them into the State of Rhode Island, by order of the military authorities of Rhode Island, in time of civil war and insurrection in said State.' This instruction the court refused to give, but did instruct the jury, that notwithstanding civil war and insurrection, as aforesaid, existed in Rhode Island, and said Olney, Ballou, Whipple and Walker were citizens of Rhode Island, and had been in arms, as insurgents, against said State, and had fresh fled from the insurgent camp, as aforesaid, to Massachusetts, upon the approach of the troops of Rhode Island, for

refuge merely, the said Olney, Ballou, Whipple and Walker upon crossing the lines of Massachusetts, were in the peace of Massachusetts and within the protection of her laws, against the pursuit of the authorities and troops of Rhode Island, and that the defendants were criminally liable for capturing said Olney, Ballou, Whipple and Walker, under the order of the State of Rhode Island, within the boundaries of Massachusetts.

And the counsel for the defendants further requested the court to instruct the jury, ' that Rhode Island, being in a state of civil war and insurrection, and her laws and government, guarantied by the constitution and laws of the United States, being assailed by domestic violence, and the State of Massachusetts, as one of the United States, being obliged by said constitution and laws, and a party to said guaranty, or obliged by the same, the said States of Rhode Island and Massachusetts were, for all the purposes of such war, but one territory under the constitution and laws of the United States; and that such war, waged upon Rhode Island, was in fact, as war by a public foreign enemy would be, a war waged upon Massachusetts, so far at least as to give to Rhode Island a right to use the territory of Massachusetts for the lawful purposes of such war ; and that, at all events, in such case, the State of Rhode Island had a right, under the constitution and laws of the United States, to order her troops over the lines and into the territory of Massachusetts, to protect herself against insurgents, as well as against a public foreign enemy, whenever she deemed it necessary so to do for her own protection ; she being, so far as her own citizens and troops were concerned, the sole judge of the necessity, and alone responsible to the State of Massachusetts for any undue or improper exercise of her authority in such case, within the territory of Massachusetts, through her troops, acting under her orders and confining themselves strictly to the mere execution of the same ; and that this was especially true when, as in the present case, the action of Rhode Island, within the territory of Massachusetts, was confined to the

capturing of her own rebel citizens only, found just over the lines.' This instruction the court refused to give, but did instruct the jury, that the State of Rhode Island had, in time of civil war and domestic insurrection, under the constitution and laws of the United States, no such rights as above claimed, within the territory of Massachusetts, and had no right to authorize the capture of her own rebel citizens within the territory of Massachusetts; and that such capture by the troops of Rhode Island, under the orders of Rhode Island, was unlawful, unless necessary in defence of the lives and property of the citizens of Rhode Island, or in defence of the State, at the time; of which necessity, or probable cause of necessity, or that there was probable cause, at the time, to suppose the existence of such a necessity, the jury, and not the State of Rhode Island, was the proper judge; and that the orders of the State of Rhode Island could not shield her citizens and soldiers from being criminally responsible in the courts of Massachusetts for acts done by them within the territory of Massachusetts, under and in compliance with such orders, in time of civil war and domestic insurrection, and whilst said citizens and soldiers of Rhode Island were subject to martial law.

And the counsel for the defendants further prayed the court to instruct the jury, ' that if they found that the said Blodgett and Hendrick were citizens of Rhode Island, actually serving as soldiers in the ranks, with the troops of Rhode Island, under regular military command, in time of civil war and domestic insurrection in said State, and under martial law, and were duly ordered by their lawful military superiors, acting under and by the authority of the State of Rhode Island, to cross the lines, and arrest, within the territory of Massachusetts, the said Olney, Ballou, Whipple and Walker, rebel citizens of Rhode Island, recently fled to Massachusetts for refuge merely from the troops of Rhode Island, the said Blodgett and Hendrick were not personally liable, in the criminal courts of Massachusetts, for executing such orders if they executed the same properly and without any excess

or unnecessary violence ; but that, if the acts by them done, in compliance with such orders, were unlawful, the said State of Rhode Island was alone responsible to the State of Massachusetts for the violation, if any, of her territorial rights, by such acts.' This instruction the court refused to give, but did instruct the jury, that the defendants were personally liable, in the criminal courts of Massachusetts, for the acts done by them as aforesaid, under the orders of Rhode Island, notwithstanding such orders given, and by them only faithfully executed.

In qualification of all the above rulings, the court, however, instructed the jury that if there existed a necessity, for the defence or protection of the lives and property of the citizens of Rhode Island, or for the defence of the State of Rhode Island, that the defendants should do the acts complained of in the indictment, or if there was probable cause, at the time, to suppose the existence of such a necessity, and the jury found such necessity, or probable cause of necessity, then they were to acquit the defendants. And much evidence, not repeated herein, was given on both sides as to the existence of such necessity, or probable cause of necessity.

To which refusals of the court so to instruct the jury as prayed for, as well as to the instructions so as aforesaid given by the court to the jury, the defendants, by their counsel, alleged exceptions.

And after the said instructions were so refused and given, as aforesaid, the jury withdrew, and afterwards returned their verdict that the said Blodgett and Hendrick were guilty in manner and form as charged in said indictment.

This case was argued at the last October term.

*J. Whipple & S. Ames*, of Rhode Island, for the defend ants. The Rev. Sts. *c.* 125, § 20, on which the indictment is framed, were not intended for a case like this, but were meant to punish the kidnapping of negroes and others, for the purpose of making them slaves.

This indictment is not for any direct injury to the Commonwealth, but for the mere consequential injury supposed to

have been sustained by reason of an injury to Olney and others. And unless they are injured, the indictment cannot be sustained ; for every indictment is founded on a private as well as a public wrong. 4 Bl. Com. 6. As Olney and others could not maintain an action for an assault and battery by the government of Rhode Island, the defendants are not liable to be punished on this indictment. As against Massachusetts, it is immaterial whether Rhode Island could rightfully send her soldiers over the lines. If she could do so, as against Olney and others, it is sufficient for this defence.

Olney and others were not in the peace of this Commonwealth; having no right of refuge here, as against the authorities of Rhode Island. No offender, who flees from one State into another, is under the protection of such other State, as against the State from which he flees. In ordinary cases, the course is prescribed by the constitution of the United States. It must be shown that the fugitive is not innocent, and a demand is to be made for his delivery. But the principle is as above stated ; and the right to seize fugitives from justice existed before the remedy was prescribed by the constitution. · 3 Story on Const. of U. S. §§ 1801–1803. 1 Kent Com. (3d ed.) 35–37. The present case, however, is not an ordinary one, in which that remedy is alone to be resorted to. War existed in Rhode Island, and, as between her and neutral States, she had all the rights which war confers, and the exercise of which was necessary to her protection and defence. Among these rights was that of pursuing her enemies, if necessary, into neutral States, and there seizing them. Grotius, Book III. *c.* 17, § 1. Bynkershoek on the Law of War, (Du Ponceau's ed.) *c.* 8, pp. 58–73. Mr. Webster on the McLeod case, in Senate Document for 1842–3, pp 130, 131. Massachusetts herself, in the time of Shays's rebellion, claimed the right to march her troops into adjacent States, and, by a resolve of March 8th 1787, authorized her governor so to do, if he should think it necessary for the purpose of subduing that rebellion. Minot's History of the Insurrections, (2d ed.) 159, 160. This was under the old confederation. *A fortiori* is it

warranted under the constitution of the United States, which guaranties to every State a republican form of government, and the protection of each of them against invasion.

But this case does not stand merely on the ground that Massachusetts was a neutral State. The several States of the Union are allies, or more than allies. "Allies" (says Bynkershoek, Du Ponceau's ed. 115) "are considered as making but one state." For many purposes, the inhabitants of the several States of the Union are one people. See 3 Story on Const. of U. S. §§ 1807 –1819. Federalist, Nos. 21, 43. The war against Rhode Island was not against her as an individual State, but against her in her federate character; against a republican form of government guarantied by Massachusetts. The blow was aimed against Massachusetts and the general government; and Rhode Island, in a case of necessity, might rightfully pursue her rebel subjects into Massachusetts, in time of civil war, for the protection of the peace of both States. And of that necessity she, and not the jury, was the judge.

The defendants were obliged to obey the order under which they seized Olney and others, and are not amenable, on this indictment, whether that order was proper or not. Soldiers, in time of war, are not personally answerable for acts done by order of their superior officers. Rutherforth's Institutes, Book II. c. 9, § 18. The Ashburton Letters, Senate Documents for 1842–3. So when a civil officer acts under the order of a magistrate who has jurisdiction, he is protected. 2 Hawk. c. 13, § 11. 2 Stark. Ev. 816, 817. There can be no offence where there is not a will as well as an act; and military orders, with a power to execute them instantly, take away all volition from the subordinates to whom they are directed.

It may be asked, what is the remedy of Massachusetts for the injury, if any, to her citizens? The answer is, that all controversies between States are, by the constitution of the United States, to be submitted to the courts of the United States. If there is any guilt in this case, it lies on the State of Rhode Island. And if there were no remedy elsewhere still the defendants would not be responsible.

*Wilkinson*, (District Attorney,) for the Commonwealth. The Rev. Sts. *c.* 125, § 20, apply to a case like this. "*Every person*, who shall forcibly seize and confine any *other person*," &c. is punishable. *Commonwealth* v. *Robinson*, Thacher's Crim. Cas. 488. Besides ; it is an elementary principle, that every human being, while within this State, is subject to this law, and entitled to its protection. Vattel, Book II. *c.* 8, § 104. And if there were any doubt on this point, the constitution of the United States gives to the citizens of each State all the privileges and immunities of citizens of the several States. 3 Story on Const. of U. S. §§ 1799, 1800.

The allegation in the indictment, whether true or false, that Olney and others were in the peace of this Commonwealth, is wholly immaterial. 4 Co. 41 *b.* 2 Hale P. C. 186.

The claim of Rhode Island to use the territory of this State, in case of civil war, in capturing her rebel citizens, who have fled hither, is wholly repudiated by the law of nations. Vattel, Book II. *c.* 7, § 93 ; Book III. *c.* 7, § 132 ; *c.* 14, § 218 ; *c.* 18, §§ 295, 296. Marten, 314. 1 Kent Com. Lecture 5. The constitution of the United States has established no such modification of national law as is contended for by the defendants. By that constitution, the general government is to protect each State from invasion. But if the defendants' doctrine be true, one State, by declaring martial law, may constitutionally invade another State, take possession of her forts, shut up her courts, and entirely prevent the execution of her laws.

By the same constitution, persons charged with crimes, who flee from justice in one State, and are found in another, are to be delivered up, on demand of the executive authority of the State from which they have fled.

When Rhode Island wishes to capture her fugitive rebel citizens, she must pursue one of these constitutional methods : She must call on the general government for aid, or apply to the executive authority of the State into which those citizens have escaped. Under the Rev. Sts. *c.* 142, §§ 8, 9, Rhode Island might have had the full benefit of the latter method.

The resolve of the Massachusetts legislature, referred to by the defendants' counsel, was never acted on. Nor was it passed until after the legislature of Rhode Island, "by a large majority," had refused the request of the government of Massachusetts for aid in apprehending the insurgents who had fled to Rhode Island for refuge from punishment. Minot's History of the Insurrections, (2d ed.) 151, 152.

The defendants are not exempted from the operation of our laws, by reason of their having acted under military orders issued by authority of the State of Rhode Island. If the doctrine of the supreme court of New York, in *McLeod's case,* 1 Hill, 377, and 25 Wend. 483, is to be adopted here, this question is settled. That doctrine has been questioned by eminent jurists; (see 26 Wend. 663–706; 3 Hill, 635–676; 4 Law Reporter, 169–197; 1 Amer. Law Magazine, 348–376;) and it is not necessary now to contend for its entire correctness. It seems to be agreed on all hands, that there are limits to the authority of a sovereign to command the services of his subjects, and to exempt them from punishment for violating the laws of other States. Vattel, Book I. c. 4, § 54. As between independent nations, the power of a sovereign thus to shield his agents is confined to such acts as he himself can perform. Vattel, Book I. c. 6, § 75; Book III. c. 2, § 15. 26 Wend. 678. But the constitution of the United States provides the only mode in which fugitives from one State into another can be arrested, and confers no authority upon the executive of one State to pursue them into another. Besides; the power of shielding agents from liability to punishment for violating the laws of another State is a war power, and can be exercised only by an executive having authority to declare war; and no State of the Union has authority, executive or legislative, to exercise a war power. Upon entering into the constitutional compact, each State expressly surrendered this power to the general government. And it is only on a great emergency, when the general government cannot protect a State, that the State may do it herself. In the present case, the facts show, and the jury have found,

that there was no such emergency, and no necessity for the acts of the defendants.

But even if Rhode Island and Massachusetts sustained towards each other the relation of sovereign States, and if there were no constitutional impediments to the authorization or sanction, by Rhode Island, of a transaction of a public nature, planned and executed by persons duly empowered to take any steps, and do any acts, which might be necessary for the defence of that State, and the protection of her citizens, still these questions would arise : Did Rhode Island require or authorize her public servants to do the acts complained of ? Or has she assumed or held herself responsible for them, since they were committed ? In *McLeod's case*, it was admitted, on all hands, that until Great Britain avowed his act, he was amenable to the laws of New York. In the case at bar, Rhode Island has repudiated the defendants' acts, and has delivered them up for trial in our courts ; and their personal responsibility is expressly asserted by all writers on national law. See Vattel, Book II. *c.* 6, §§ 76, 77. Burlamaqui, Part 4, *c.* 3, §§ 18, 19.

It is contended for the defendants, that they are not amenable, because they acted under orders which they were bound to obey. But it is no new thing to hold soldiers liable for acts done under the unlawful orders of their commanders. The trial of the British soldiers in Boston, in 1770, is an instance. The English soldiers, who fired upon the mob in St. George's Field, were tried for murder. A commander of a ship of war of the United States is not protected by unwarranted instructions from the president of the United States. *Little* v. *Barreme*, 2 Cranch, 170. See also Story's Conflict of Laws, §§ 8, 21, 22. In 1806, William S. Smith, who was indicted for setting on foot a military expedition against the dominions of Spain, offered to prove, in his defence, that the expedition was set on foot with the knowledge and approbation of the executive department of our government. The court held that this evidence was inadmissible ; the executive having no right to dispense with the laws.

See Trials of Smith and Ogden, reported by Thomas Lloyd. In the *United States* v. *Bright*, (decided in 1809, in the circuit court of the United States for the district of Pennsylvania, and cited in 1 Wharton's Digest, 4th ed. 347,) it was held that it is not a justification of the offence of obstructing the execution of process issued out of a federal court, that the defendants were subordinate officers of the militia of a State, and acted under the sanction of a law of the State, and under orders from the governor and commander in chief of the militia of the State.

SHAW, C. J.   The great Rhode Island controversy, threatening, and at one time involving, the dangers and troubles of insurrection and civil war, out of which this case grew, having happily passed away, the case itself has lost much of the interest with which it was once invested.   It presents questions of unusual magnitude and importance, lying beyond the scope of those investigations with which the administration of the criminal law is usually conversant ; but happily they are questions of rare occurrence.   We shall allude to the facts, very briefly, to make the points intelligible.

The indictment was originally returned against three persons, of whom one was acquitted and the others convicted. It was founded on the provisions of the Rev. Sts. *c.* 125, § 20, which prohibit the unlawful and forcible seizure, imprisonment, or abduction of persons.

The proof, on the part of the prosecution, tended to show, that the defendants, with about twenty other persons, armed with military weapons, about the hour of one o'clock at night, broke and entered the house of Jeremiah Crooks, who kept a tavern in Bellingham, in this county, and there seized and bound the four persons named in the indictment, to wit, William T. Olney, Oliver Ballou, Arnold Whipple and Timothy Walker, kept them there some hours in custody, and then carried them bound to Rhode Island.   Some circumstances of aggravation, in the conduct of the defendants, are stated in the bill of exceptions, which seem not material to any principle involved in the case.

Commonwealth *v.* Blodgett & another.

It was argued in behalf of the defendants, that this case, if proved, was not within the aforesaid statute, which was rather designed to prevent and punish kidnapping and unlawfully seizing negroes or colored persons, for the purpose of making them slaves. The terms of the statute are as follows : " Every person who, without lawful authority, shall forcibly or secretly confine or imprison any other person, within this State, against his will, or shall forcibly carry or send such person out of this State, or shall forcibly seize and confine, or shall inveigle or kidnap any other person, with intent to cause such person to be secretly confined or imprisoned in this State, against his will, or to cause such person to be sent out of this State, against his will, or to be sold as a slave," &c. " shall be punished," &c.

It may be very probable, that the legislature had in mind the offence of kidnapping, in connexion with slavery, as the more immediate inducement to the passing of the act ; but the terms of the act are broad enough to include the case of unlawful confinement of another, with the intent to cause him to be carried out of this State against his will. And it is not unusual in legislation, where a particular apprehended wrong or grievance is the immediate occasion for the passing of an act, to extend it to other wrongs of the like kind, and make a general instead of a specific provision. But further; this is no new provision in the revised statutes. It is taken substantially from the ˘preëxisting *St.* of 1784, *c.* 72, § 10, which is the old *habeas corpus* act. The court are of opinion, that the case is within the statute in question, and that the first exception cannot be sustained.

The other exceptions turn upon the matter of justification or excuse arising out of the facts narrated in the very voluminous bill of exceptions, setting forth almost the entire history of the insurrection and civil war in Rhode Island, occasioned by an attempt to overthrow the existing government of the State, and to replace it by another, claimed to be the people's constitution. Perhaps many of the facts, set forth in the bill of exceptions, might not, in strict law, be

susceptible of judicial proof; but being of general notoriety, we presume they were not much contested, and were introduced in order to show the effect and application of the instructions given or withheld by the court, in matter of law. It is these only which we are called upon to revise. They are extremely important to the peace of the country and the security and stability of all the state governments. The court have derived great benefit from the full and able arguments of counsel on the subject, and have given the subject the attention which its importance demanded.

It will not be necessary to recapitulate or even make a summary of the facts. They are fully detailed in the bill of exceptions. Those that concern these defendants more particularly are as follows : That an organized attempt was made to overthrow the existing government of the State, by force of arms; that the legislature had, by an act in due form, declared the State to be under martial law ; that William G. McNeill, Esq. had been appointed major-general and commander in chief of the forces raised by the State to oppose the insurrection ; that the insurgents, organized and in military array, were stationed, in some force, at Chepachet and Woonsocket, villages bordering on the line of Massachusetts. It further appears, that on the evening of the 27th of June, the camp of the insurgents, at Chepachet, and other persons there assembled, were advised to disperse ; that they did not afterwards appear in any considerable force, but that fears were entertained, by the people of Rhode Island, that they would again assemble within the limits of Connecticut or Massachusetts, and again annoy the people of Rhode Island ; that on the 29th, an order was published, stating that there was no longer a necessity for the continuance of the troops in general in the field, and that they might return to their several homes ; that various orders were given, with a view to arresting the fugitives, whether within the limits of the State or not, to the extent of fifty miles from Chepachet ; that by order of Major Martin, the defendant Blodgett, who was in the military service of the State, with the other

Commonwealth *v.* Blodgett & another.

defendant, Hendrick, as a guide, with about twenty men, proceeded, as before stated, to Crooks's tavern in Bellingham, and there found and arrested the four persons named, who had been in arms against the State, but were not then in arms, or engaged with others in any military operation; that the neighborhood was peaceful and quiet, the house was fastened, and the inmates asleep.

Upon these facts, stated more at large in the bill of exceptions, the counsel for the defendants prayed the court to instruct the jury, that if they found that the said Olney and others were citizens of Rhode Island, and had been in arms as insurgents, as aforesaid, against said State, and, upon the approach of the troops of said State, had fresh fled from the insurgent camp to Massachusetts, for refuge from the authorities and troops of Rhode Island merely, they were not in the peace of Massachusetts, &c. The court declined so to instruct, but did instruct the jury, that if Rhode Island was in a state of civil war, and said Olney and others stood in the relation contemplated, yet, upon crossing the lines of Massachusetts, they were in the peace of the Commonwealth, and within the protection of her laws, exempt from the pursuit of the authorities and troops of Rhode Island; and that the defendants were criminally responsible for capturing the said Olney and others, within the boundaries of Massachusetts.

The court are of opinion that this instruction was correct. It has been argued that the State of Rhode Island, and the other States, under the circumstances in which she was placed, stood in the relation of foreign sovereign States, one of which was at war, and the other neutral; and we were referred to authorities from the laws of nations, to ascertain their respective rights and duties. It would be dangerous, perhaps impracticable, to adopt this reasoning to its full extent, and carry it out into all its consequences. The relations of the States of the Union to each other are very peculiar, and give rise to questions of great delicacy and difficulty. If the States, and the citizens of States, are to be placed in the relations of belligerents and neutrals, and bound by the la...

of nations, then they must have the power of regulating
their duties and obligations by negotiations and treaties, and
thus be enabled more effectually to provide for the perform-
ance of their relative duties, and the security of their respective
rights. But the States are expressly prohibited from entering
into any treaty, alliance or confederation, or, without the con-
sent of congress, to enter into any agreement or compact
with another State, or engage in war, unless actually invaded,
or in such imminent danger as will not admit of delay. They
are, therefore, in the condition of States sovereign *to some*
purposes, but who have by compact renounced and relin-
quished their sovereign powers, in regard to war and peace,
and, of course, to the regulation and control of the incidents
to war and peace, except the power of taking warlike meas-
ures, strictly and purely defensive, in case of an exigency,
which will admit of no delay. In all other respects, the
power of making war and peace, of treaties and alliances,
is vested absolutely and exclusively in the general govern-
ment, with their incidents. But as a compensation for this
surrender, the general government of the United States is
bound to protect each State against invasion, and against do-
mestic violence. The constitution of the United States is
to be taken as a whole ; and whilst it restrains the States
from making war and peace, and exercising powers incidental
thereto, it assumes that the general government will do its
duty, and effectually secure to each State that immunity from
all violence, foreign and domestic, which was the obvious
consideration for the surrender of these great powers. It is
useless to speculate upon the contingency, as to what would
be the rights of the States in case the general government
should fail to afford that protection to States which the con-
stitution guaranties to them. Such a state of things is not
to be supposed. It would be one of revolution and anarchy,
in which a regard to self-defence and public safety would
constitute an exigency that would warrant such measures as
the necessity of the case might require, under the maxim
*salus populi suprema est lex.* The necessity, which would

create such an exigency, must limit and direct the means of meeting it.

But supposing, for the purpose of the argument, that the relations of the States to each other were those of sovereign States, in one of which an insurrection against the government existed; we think the instructions given in this case, upon the facts stated in the bill of exceptions, were correct. The exclusive right of every sovereign State to its own territory, and to the regulation and government of it, is absolute and inviolable, and extends to all persons within it. Every person entering the territory owes allegiance to the government, temporary indeed, but absolute. Whilst he continues within it, he is bound, like any other subject, by the laws of the State, owes it obedience, and is liable to the operation of its criminal laws; and as a correlative right, he is regarded as a subject, for the purpose of protection and immunity from arrest, and all forcible invasion of his liberty or property, by any other State, except so far as the exercise of such right by foreign authority is stipulated for, by treaty, amongst sovereign States, or, amongst the States of this Union, by the constitution of the United States, and the laws and treaties made under it. According to these principles, which seem to us plain and well settled, Olney and the other persons, found at Crooks's tavern in Bellingham, owed allegiance to Massachusetts, whilst they remained within the limits of the State; they were subject to its laws, would have been responsible for any violation of them, and, for the time being, were in the peace of the Commonwealth.

We do not mean to be understood as holding that soldiers and subordinate military officers, who are ordered by their sovereign to enter the territory of another State to pursue an enemy, and for any other purpose, may not rightfully claim impunity from the animadversion of the criminal laws of the country invaded. Such an invasion, however, must be deemed to be made *flagrante bello*, whether war have been declared or not; because it is in itself an act of war. But this could not be justified by an order of the subordinate

military authorities of a State, in the exercise of their ordinary functions in the defence of a State. Nothing but the sovereign power of the State, by a previous order, directing such invasion, or by a subsequent ratification, when done in its name, will warrant such invasion, and excuse the subordinates engaged in it; because it emanates from the sovereign authority having the power to make war. The wrong done by such an invasion then becomes a question of negotiation between sovereigns, and the subordinate agents are entitled to immunity.

The court, in saying that in their judgment the instruction to the jury was correct, in charging them that Olney, Ballou, Whipple and Walker, upon crossing the lines of Massachusetts, were in the peace of the Commonwealth, and within the protection of her laws, against the pursuit of the authorities and troops of Rhode Island, and that the defendants were criminally liable for capturing the said Olney and others, have done so on the facts stated, and in connexion with the qualifying instruction given at the same time. It was this : That if there existed a *necessity*, for the defence or protection of the lives and property of the citizens of Rhode Island, or for the defence of the State of Rhode Island, that the defendants should do the acts complained of in the indictment, or if there was probable cause to suppose, at the time, the existence of such a necessity, and the jury found such necessity or probable cause, they were to acquit them. And much evidence was given on both sides upon this question of fact. This instruction gave the defendants the full benefit of any excuse, arising from the use of force in the necessary defence of the State and its citizens, in whose service they were engaged ; leaving a great latitude as to the means necessary to such defence. It is not requisite, we think, in the present case, to attempt drawing any exact line of distinction as to the measures which such necessary defence would warrant, nor, perhaps, would it be practicable ; because it must depend much on the circumstances of each case. In the present case, it appears that the arrest of Olney and others was made

Commonwealth *v.* Blodgett & another.

at midnight, in a dwelling-house and common tavern, nearly three miles from the state line, the men not being in arms or in military array, or in such numbers as to be immediately formidable ; and it is difficult to perceive how such act could be considered as done in the necessary defence of the territory of Rhode Island. The men had been in arms, and probably had rendered themselves amenable to the laws of Rhode Island ; and it might be a prudent precaution, on the part of that State, to discover, pursue and arrest them, as suspicious persons, of which they had no right to complain ; and if it could have been done without violating the laws, the peace, or the rights of this Commonwealth, it would have been quite excusable. But the question was rightly submitted to the jury, as one of strictly necessary defence.

Another ground taken for the defence was, that Rhode Island and Massachusetts stood to each other in the relation of allies ; that a civil war existed in Rhode Island ; and that the military authorities of that State had a right to pursue the common enemy into the territory of Massachusetts. The counsel requested the court to instruct the jury, that Rhode Island being in a state of civil war and insurrection, and her laws and government guarantied by the constitution and laws of the United States, and being assailed by domestic violence, and the State of Massachusetts, as one of the United States, being obliged by said constitution and laws, and a party to such guaranty, these States were, for all the purposes of such war, but one territory ; and that such war, waged against Rhode Island, was in fact a war waged by a public enemy, and in effect a war waged against Massachusetts, so far at least as to give to Rhode Island a right to use the territory of Massachusetts for the lawful purposes of such war ; and, at all events, had a right, under the constitution and laws of the United States, to order her troops over the lines and into the State of Massachusetts, to protect herself against insurgents, as well as against a public foreign enemy, whenever she deemed it necessary so to do for her own protection ; she being, so far as her own citizens and troops were

concerned, the sole judge of the necessity, and alone responsible to the State of Massachusetts for any undue exercise of authority through troops acting under her orders, and confining themselves strictly to the mere execution of the same ; and that this was especially true, when, as in the present case, the action of Rhode Island was confined to the capturing of her own rebel citizens only, found just over the lines.

This instruction the court refused to give, but instructed the jury, that in the case supposed, the State of Rhode Island had no such rights as above claimed, within the territory of Massachusetts, to capture her own rebel citizens ; and that such captures were unlawful, unless necessary in the defence of the lives and property of the citizens of Rhode Island, at the time ; of which necessity, or probable cause, or supposed probable cause, the jury, and not the State of Rhode Island, was the proper judge ; and that the orders of the State of Rhode Island could not shield her citizens and soldiers from being criminally responsible in the courts of Massachusetts, for acts done in the territory of Massachusetts, under and in compliance with such orders, in time of civil war and domestic insurrection, and whilst such citizens and soldiers were subject to martial law.

We are of opinion, that the court below decided correctly in refusing to give the instruction prayed for.    That instruction assumes matters both as to the relations of the States to each other, and as to the authority under which the acts proposed to be excused or justified were done, and as to the condition of the persons arrested, at the time and place of arrest.

As to the relations in which the States stood to each other, which we have already partly considered :  Suppose that the State of Massachusetts was ultimately bound to render aid to Rhode Island against domestic violence ; some competent power must judge and decide upon the existence of the *casus fœderis ;* and it cannot be possible that Massachusetts, and all the other States in the Union, are to be placed in a

state of war, by the sole judgment of the acting government of the State of Rhode Island. It must be authoritatively determined and made known, that domestic violence, and actual insurrection against the government of the State, exist, and that the acting government, resisting such violence and insurrection, by force of arms, is the true and legitimate government of the State, and entitled to the aid and assistance intended to be secured by the constitution of the United States to the respective States. If the State of Massachusetts retains her sovereign power to this extent, then it is for the government of Massachusetts, by some authentic act, to declare or recognize such state of civil war, and such duty of Massachusetts as an ally; or, if this portion of the sovereignty of the State is delegated to the general government, then it is further to recognize and declare the *casus fœderis*, and by ordering out regular troops, and the ships of war, or by drafts of militia from other States, or otherwise, to direct the measures to be pursued. If it were true, as claimed by the defendants, that one State is the sole and exclusive judge of the necessity for waging war against its rebel subjects, and thereupon to confer on their troops an authority to make an unlimited use of the territories of all other States, it would be placing such States in a state of war, without their own consent, or the consent of the general government, to whom the power of judging and acting, in the case supposed, has been confided by the constitution. Such a state of things would tend greatly to destroy the peace, and put at hazard the security, of the States and their citizens. Besides; such a principle, if admitted, would leave neither to the government of the State, the use of whose territory is thus claimed for hostile purposes, nor to the government of the United States, intrusted with that portion of the sovereign power of the States, the power of deciding whether the government of a State, at war with its citizens, is the true and legitimate government, or a mere usurped authority. Such a claim appears to us to be wholly untenable.

But further; the prayer for instruction assumed that the

acts done by the defendants, with the armed party accompanying them, who proceeded to Bellingham, entered the house of Crooks, and seized and carried away Olney and others, as rebels against the authority of the State of Rhode Island, were done under the sovereign authority of the State, either by a previous order, emanating from the government, or that the acts done in their name were subsequently, in due form, ratified, adopted and expressly sanctioned by the authority of the State of Rhode Island, so as to transfer the responsibility, whatever it was, from the individuals to the State. But so far from this, the case shows that they acted under the authority of an order, given by Major Martin, to do the specific duty, in conformity with a more general direction from the military commanding officer, directing the officers and soldiers to scour the country, to the distance of fifty miles, without regard to state lines, in order to secure the insurgents who had fled. The specific order to cross the lines of Massachusetts did not emanate from the government; it was an ordinary military operation, undertaken by the military officers, in pursuance of their general duty to defend the State against the insurgent forces. And so far from being specifically ratified, sanctioned and adopted, by the State of Rhode Island, the governor, when applied to for that purpose by the governor of Massachusetts, declined so to do, but repudiated it, and denied that it was done by authority of the State. And the act, stated in the bill of exceptions, passed by the legislature of Rhode Island, to indemnify these defendants, against certain expenses occasioned by their prosecution, is far from that express adoption which will secure the citizen by taking the responsibility upon the State.

The other matters assumed in the prayer in question relate to the particular situation of the men at the time, as being captured just over the lines, &c. These are not of much importance, but do not seem to be warranted by the evidence.

And the court are also of opinion, that the instruction actually given, under this prayer, viz. that the acts of the

defendants were unlawful, unless done in the necessary defence of the lives and property of the citizens of Rhode Island, or in the necessary defence of the State, was sufficiently favorable to the defendants.

The last prayer for instruction is thus stated : The counsel for the defendants further prayed the court to instruct the jury, that if they found that the said Blodgett and Hendrick were citizens of Rhode Island, actually serving as soldiers in the ranks, with the troops of Rhode Island, under regular military command, in time of civil war and domestic insurrection in said State, and under martial law, and were duly ordered by their lawful military superiors, acting under and by authority of the State of Rhode Island, to cross the lines and arrest, within the territory of Massachusetts, the said Olney, Ballou, Whipple and Walker, rebel citizens of Rhode Island, recently fled to Massachusetts, for refuge merely, from the troops of Rhode Island, they were not personally liable, in the criminal courts of Massachusetts, for executing such orders without excess or unnecessary violence ; but that the State of Rhode Island was alone responsible to the State of Massachusetts for the violation of her territorial rights. This instruction the court refused to give, but did instruct the jury that the defendants were personally liable, in the criminal courts of this Commonwealth, for the acts done by them as aforesaid, under the orders of the State of Rhode Island, notwithstanding such orders given, and only by them faithfully executed.

Upon this ground, the main argument, in justification or excuse of the defendants, has been placed. We are to presume that the instructions and directions asked for were so asked for in reference to the case stated in the bill of exceptions, and not as mere abstract propositions ; and, as such, their correctness in point of law, and their adaptation to the case on trial, are to be considered. It was then a request to the judge, to instruct the jury, that if the ordinary military officers of a State, in the exercise of the military powers vested in them for the defence and protection of the State against an

insurrection, after martial law declared by the legislature, should order subordinate officers and soldiers to enter a neutral territory, the territory of another State, to arrest and secure the persons of rebel citizens, recently in arms, the persons thus ordered, being bound to obey, under the penalties of disobedience of a military command which they have no means of resisting, would not subject themselves to the animadversion of the criminal laws of the State whose territory is thus violated. This proposition, we think, cannot be maintained, upon any well recognized principle of public law. It would be an authority to every military officer, superior or subordinate, by means of orders to those under him, in all cases where military forces are raised and organized, to extend hostilities indefinitely into the territories of neutral and independent States, to the imminent danger of the lives, property and possessions of the subjects of such neutral State; and the only remedy for the injured party would be by way of remonstrance to the government of the party doing such wrong. But, surely, this is not one of the ordinary or incidental powers conferred upon military officers by their own government. They are indeed to defend the territory and the just rights of their States by warlike measures; but these must be taken in reference to the just rights and limited powers of the State itself, under whose authority they act, and they cannot, by force of such authority, commit hostile acts against independent States, with whom their own State is at peace. If such military entry into the territory of a neutral State is supposed necessary, such act is a high prerogative of sovereignty, and the necessity of it must be judged of, and the warrant for it must be given by the express command or direction of the sovereign authority. Any other principle would make the peace of any State depend upon the judgment and discretion, or even the rash and ill judged act, of every military officer, in time of war.

It has been argued upon the ground, that men ought not to be held responsible for acts done in obedience to orders which they are compelled to obey, under severe military

discipline. But this is not the true principle ; and it would be dangerous in the extreme to carry it out into its consequences. The more general and the sounder rule is, that he who does acts injurious to the rights of others can excuse himself, as against the party injured, by pleading the *lawful* commands only of a superior, whom he is bound to obey. A man may be often so placed in civil life, and more especially in military life, as to be obliged to execute unlawful commands, on pain of severe penal consequences. As against the party giving such command, he will be justified ; *in foro conscientiæ* he may be excusable ; but towards the party injured, the act is done at his own peril, and he must stand responsible.

Had the government of Rhode Island ordered the expedition into Massachusetts, it would have presented the question argued in the present case, viz. whether the men would have been protected by such order, and the State alone be responsible. War may be made without being declared ; and when it is so made and recognized by the governments of the respective parties, then the rights belonging to belligerents, and incident to war, attach to the States and their respective citizens and subjects, in arms or otherwise. The argument in excuse of the defendants, to be effectual, must be put upon the ground, and g ₁ to the extent, that in the actual state of things, there was war *de facto*, between Rhode Island and Massachusetts. But this is too extravagant a view to be taken by any aspect in which, upon the facts, the case can be placed. These facts show that the proceeding of Blodgett and others, in passing over the lines of Massachusetts, and doing the acts which are the subject of this prosecution, though ordered by Major Martin, acting under the general authority of Major-General McNeill, was not the act of the State of Rhode Island, either by previous special authority, or subsequent ratification or adoption. The authority of the commanding and other military officers is *prima facie* limited to the defence of the territory and territorial rights of the State appointing them, and must stand so limited, unless it is shown that an authority was specially vested in them by the State, to enter the territory of

another State. In the present case, if the act itself was equivocal, it was put beyond doubt, by the answer and denial of the governor of Rhode Island, that the act was not authorized or adopted as the act of the State. The acts of the defendants then, being plainly a violation of the rights and laws of Massachusetts, and of the legal rights of persons lawfully within its protection, and being denied and repudiated as an act of the State of Rhode Island, it follows, as a necessary legal consequence, that it was a lawless and unjustifiable act of violence on the part of the defendants, subjecting them, and all who assisted them, to be punished for such violation, by our laws.

If these States had stood in the relation, in all respects, of foreign states, (which is the supposition in the argument, and the one, perhaps, most favorable to the defendants,) we do not see how they could make out their justification, since the executive of Rhode Island has repudiated the act as an act of the State.

Whether, if the measure of sending a military force into Massachusetts, being in its nature an act of war, would have justified, and rendered the persons sent free from punishment, the facts of this case do not require us to consider. It would depend upon questions arising out of the peculiar relations in which the States stand to each other and to the general government. The constitution of the United States still recognizes that qualified sovereignty of a State, so far as to raise military forces for their own protection and defence, against both foreign invasion and domestic insurrection. The first security of a State against violence is to be sought in the duty imposed on the United States government, to take order in that respect. If, for any cause and by any means, imperious necessity or otherwise, that fails, and the State in which insurrection arises is left to take care of its own defence, it may be a grave question, whether such State would not be remitted to its natural and original rights of sovereignty, with its recognized incidents, to the extent necessary to meet that exigency, and for that purpose to issue the necessary declarations,

enter into stipulations with other States, and the like. But even in that case, soldiers and others, acting in the defence of such a State, could have no higher rights, no higher claim of impunity for acts done to the injury of others, than the citizens and subjects of a sovereign and independent State, acting under like circumstances.

On the whole, the court are of opinion that the instructions were correct and carefully considered, as well as the refusal of instructions prayed for, and therefore that the exceptions must be overruled.